UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Aug 05, 2021

| | |
|---|---|
| IN RE: | |
| PENTECOST, Claude Daniel Jr., | Case No. 20-10651-R |
| PENTECOST, Jean Rae, | Chapter 7 |
| Debtors. | |
| WANDA G. BERRY, | |
| Plaintiff, | |
| v. | Adv. No. 20-1039-R |
| CLAUDE DANIEL PENTECOST, JR., | |
| Defendant. | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Plaintiff's Motion for Summary Judgment and Brief in Support (Adv. Doc. 15) ("Motion") filed by Plaintiff Wanda G. Berry ("Plaintiff"); Defendant's Response to Motion for Summary Judgment and Brief in Support (Adv. Doc. 16) ("Response") and Defendant's Exhibit Number One Associated with the Defendant's Response to the Motion for Summary Judgment (Adv. Doc. 17) filed by Debtor/Defendant Claude Daniel Pentecost, Jr. ("Pentecost"); and Plaintiff's Reply Brief to Defendant's Response to Motion for Summary Judgment (Adv. Doc. 18).

**I.    Jurisdiction**

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I), and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law."[1] A fact is "'material' if under the substantive law it is essential to the proper disposition of the claim."[2] An issue is "'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[3] "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[4] Reasonable inferences that may be made from the record should be drawn in favor of the non-moving party.[5] "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case."[6]

## III. Undisputed Facts

In her Complaint (Adv. Doc. 1), Plaintiff alleges that Pentecost is liable to her for an unspecified amount of damages for committing fraud and defalcation while acting in a fiduciary capacity, and that such debt is excepted from discharge under Section 523(a)(4)

---

[1] Fed. R. Civ. P. 56(a), made applicable to this proceeding by Bankruptcy Rule 7056.

[2] Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).

[3] Id., citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[4] Anderson, 477 U.S. at 249.

[5] See Adler, 144 F.3d at 670.

[6] Fed. R. Civ. P. 56(g), made applicable to this proceeding by Bankruptcy Rule 7056.

of the Bankruptcy Code.[7] She further alleges that Pentecost is liable to her for an unspecified amount of damages arising from violations of state securities laws, and that such debt is non-dischargeable under § 523(a)(19). Plaintiff seeks summary judgment solely on her § 523(a)(19) claim. She argues that based on findings made in an Oklahoma Department of Securities proceeding, and the entry of a Consent Order in that proceeding, it is undisputed that Pentecost violated securities laws in connection with borrowing money from Plaintiff, and therefore she is entitled to judgment as a matter of law.

The Court finds that the following material facts are not genuinely in dispute:

Pentecost was Plaintiff's investment adviser from 1999 to 2020. Motion at 2, ¶ 1. As Plaintiff's financial adviser, Pentecost owed Plaintiff fiduciary duties. Motion at 3, ¶ 2; Exhibit 1 to the Motion at Page 7 of 9, ¶ 43. On or about May 27, 2015, Pentecost induced Plaintiff to loan $45,000 to Pentecost, or in the alternative, to Sonus Rights Management LLC ("Sonus") (the "Loan"), pursuant to the terms of an Unsecured Promissory Note ("Note"). Motion at 3, ¶¶ 3-4; Response at Pages 2-3 and 11-12 of 14. The Note identifies the "Borrower" as "C Dan Pentecost, as managing partner, Sonus Rights Management LLC." Exhibit 2 to the Motion. Pentecost executed the Note as follows:

> "C Dan Pentecost
>
> By: /s/C Dan Pentecost
> Name: C Dan Pentecost"

Id. At the time the Loan was made, Pentecost owned an interest in, and acted as managing member or partner of, Sonus. Exhibit 1 to the Motion at Page 5 of 9, ¶ 24; Exhibit 8 to the

---

[7] Unless otherwise specified, all references to "Section" or "§" are to sections in Title 11, United States Code.

Motion at Page 2 of 8, ¶ 1(e), and at Page 3 of 8, ¶¶ 2(a), 3. Sonus had no assets at the time Pentecost solicited the Loan from Plaintiff. Exhibit 8 to the Motion at Page 5 of 8, ¶ 17(a). The Loan has not been repaid by Pentecost or by Sonus. Exhibit 3 to the Motion (Schedule F).[8]

Pentecost filed for relief under Chapter 7 of the Bankruptcy Code on April 16, 2020. Main Case Doc. 1. On his Schedule F, Pentecost listed Plaintiff as an unsecured creditor in the amount of $35,000, indicating the type of debt as a "Personal Loan." Exhibit 3 to the Motion. In his Statement of Financial Affairs, Pentecost represented that he paid $1,500 to Plaintiff in 2018. Id.

---

[8] Pentecost's disclosures of the details of the Loan in his Schedules and Statement of Financial Affairs are riddled with inconsistencies and errors. On his Schedule F, Pentecost listed the amount of the debt to Plaintiff as $35,000, but he does not dispute that the original principal amount of the Note was $45,000, and that Plaintiff has been repaid no more than $2,000. Pentecost further represented that the debt to Plaintiff was incurred in 2019, but in his Response, he states that he "listed Plaintiff as an unsecured creditor in his individual Chapter 7 Bankruptcy petition *referencing the debt of May 2015*." Response at Page 11 of 14 (emphasis added). He also indicated on Schedule F that he and his wife are both liable for the debt, and he did not check any box to indicate that the debt was disputed, unliquidated, or contingent.

Pentecost now claims that Sonus is the sole obligor on the Note and that he listed the debt as his own liability out of "an abundance of caution" (Response at Page 3 of 14). He, however, failed to identify Sonus as liable for this debt on his Schedule H. Main Case Doc. 1 at 41-44.

Pentecost's disclosures regarding his interest in Sonus are also inconsistent. On Schedule B, he claimed he owned 100% of Sonus, but in Part 11 of his Statement of Financial Affairs, he failed to list Sonus as one of the businesses he owned within four years of his bankruptcy filing. Main Case Doc. 1 at 15-16, 74-75.

Although these discrepancies may be relevant to Pentecost's credibility, the Court cannot weigh conflicting evidence on summary judgment to determine whether Pentecost, Sonus, or both are liable on the Note.

At some point, attorneys in the Enforcement Division ("Enforcement Attorneys") of the Oklahoma Department of Securities ("ODS") investigated the solvency and regulatory compliance of Pentecost and his wholly-owned corporation, Pentecost Capital Management, Inc. ("PCM"). On August 3, 2020, the Enforcement Attorneys submitted proposed findings of fact, authorities, and conclusions of law to the Administrator of the ODS in support of their recommendation that the registrations of Pentecost and PCM be revoked (the "Recommendation"). Exhibit 4 to the Motion.[9] The Recommendation was based upon the Enforcement Attorneys' conclusions that Pentecost and PCM were insolvent and that--

> Respondents have engaged in unethical practices in the securities business within the previous ten years, in violation of Rule 660:11-7-42 [of the Oklahoma Securities Commission and the Administrator of the Department of Securities], by:
> a. borrowing money from clients,
> b. recommending unsuitable transactions and investment strategies to Client A, and
> c. breaching their fiduciary duties to Client A.

Exhibit 4 to the Motion at 8, ¶ 2. Pentecost does not dispute that the findings as to Client A involve his transactions with and on behalf of Plaintiff.

The Enforcement Attorneys outlined their factual basis for concluding that Pentecost committed unethical practices on pages 2 through 5 of the Recommendation.

---

[9] Pentecost does not agree with the findings and conclusions expressed in the ODS proceeding, but he does not challenge the authenticity of the ODS documents attached to the Motion at Exhibits 4, 5, 6, and 7. It is undisputed that the documents are part of the record of the ODS proceeding, and the Court quotes portions of the documents solely to establish the scope and procedural history of the administrative proceeding that Plaintiff relies upon for summary judgment.

They include findings that Pentecost had "discretionary authority" over Client A's brokerage account and that Client A relied on Pentecost to choose the securities to buy and sell in her account. Exhibit 4 to the Motion at 2, ¶ 11. They contend that Pentecost made "unsuitable purchases" of securities on the account of a "vulnerable 92-year-old widow and unsophisticated investor" who described herself as an "extremely careful investor" and who "relied on monthly withdrawals from her brokerage account to pay for her living expenses." Id. at 2-3, ¶¶ 8, 9, 15. The alleged unsuitable investment strategies included advising Plaintiff to open a margin account and purchasing securities on margin, and investing Plaintiff's funds in risky, highly volatile leveraged exchange-traded funds (ETFs), wherein an investor could potentially "lose the full principal value of his/her investment in a single day." Id. at 3, ¶ 17 and at 4, ¶ 18. The Enforcement Attorneys further found that the leveraged ETFs were designed to be traded on a daily basis, but Pentecost held them in Plaintiff's account as long-term investments. Id. at 4, ¶ 19.

With respect to the Loan, the Enforcement Attorneys found that "Pentecost, as managing partner of Sonus Rights Managements, LLC, borrowed $45,000 from Client A" which was due and payable in full on July 10, 2015, and had not been repaid. Id. at 4, ¶¶ 20, 21. Further, they stated that "[f]unds drawn on margin from Client A's brokerage account partially funded Client A's loan to Pentecost. The loan transaction left Client A's brokerage account with a margin loan balance of $61,575.25" and an account balance of $164,355.56. Id. at 4, ¶ 22.

Additionally, the Enforcement Attorneys asserted that Pentecost sold Plaintiff a "highly speculative" and illiquid limited partnership interest in another entity under

6

Pentecost's control[10] and completed the transaction by wiring $50,000 out of Plaintiff's brokerage account, some of which was withdrawn on margin, which increased Plaintiff's margin loan balance to $70,060.85 and reduced her account value to $104,512.50. Id. at 4-5, ¶¶ 23-27.

The Recommendation was submitted to the Administrator, who adopted the findings of fact and conclusions of law, entered a Summary Order Suspending Registrations, and gave Pentecost and PCM notice of an opportunity to contest the findings and conclusions ("Summary Order").  Exhibit 5 to the Motion.

On August 21, 2020, Pentecost filed an "answer[] to the Recommendation and Summary Order, including motions to dismiss, and requested hearings on the Recommendation and Summary Order." Exhibit 6 to the Motion at 1.  Pentecost's answer and motion to dismiss are not part of the record herein.  A hearing was held on September 18, 2020, and the hearing officer filed her report and recommendation with the Administrator.  Id. at 2.  Neither a transcript of the hearing, nor the hearing officer's report and recommendation are part of the record herein. In an agreement between Pentecost and the Administrator, however, the parties summarized the hearing officer's recommendation and the response of the Administrator as follows:

> The Hearing Officer found that Respondents did not present information in their Answer to the Summary Order or present evidence during the hearing to refute the findings of fact and conclusions of law relating to the Respondents' insolvency and unethical practices set forth in the Recommendation and incorporated by reference in the Summary Order. The Hearing Officer, finding the issuance of the Summary Order to be within

---

[10]   Pentecost admits that he "owned, controlled, or had an ownership interest in PMP Investors I, LLP at the time Plaintiff invested in or loaned money to said Entity." Exhibit 1 to the Motion at Page 6 of 9, ¶ 28.

7

>the Administrator's statutory authority, further found it to be in the public interest that the Respondents' registrations continue to be suspended until the final determination of the administrative proceeding.
>
>The Hearing Officer recommended that Respondents' motion to dismiss the Summary Order be denied and that the suspension of registration be extended until the final determination of the administrative proceeding.
>
>On September 28, 2020, the Administrator issued an order denying Respondents' motion to dismiss the Summary Order and continuing the effectiveness of the Summary Order until final determination of the administrative proceeding, for which a hearing is scheduled to commence on November 18, 2020.

Exhibit 6 to the Motion at 2.

On October 21, 2020, Pentecost waived his right to a further hearing and stipulated to the entry of a Consent Order revoking PCM's and Pentecost's investment adviser registrations in exchange for the Administrator's agreement to refrain from taking further action with respect to the allegations set forth in the Recommendation. Exhibit 6 to the Motion. The Administrator signed and filed the Consent Order on October 21, 2020. Exhibit 7 to the Motion. As a result, the evidentiary hearing set for November 28, 2020, to finally determine whether Pentecost's investment advice and management of Plaintiff's investments violated Oklahoma securities laws or regulations was not held.

**IV.  Discussion**

    A.  <u>Effect of the Consent Order</u>

Plaintiff argues that the findings and conclusions made in the ODS proceeding, and the entry of the Consent Order, entitle her to judgment as a matter of law on her § 523(a)(19) claim. Section 523(a)(19) excepts from a debtor's discharge any debt that –

>(A)  is for –
>>(i) the violation of . . . any of the State securities laws, or any regulation or order issued under such . . . State securities laws; or

8

  (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B) results, before, on, or after the date on which the petition was filed, from –

  (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

  (ii) any settlement agreement entered into by the debtor; or

  (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.[11]

Section 523(a)(19) was adopted in 2002 "to address perceived loopholes in securities laws after the Enron debacle"[12] that allowed "wrongdoers to discharge their obligations under court judgments or settlements based on securities fraud and other securities violations."[13] The discharge exception "serves the broad remedial purpose of 'hold[ing] accountable those who violate securities laws after a government unit or private suit results in a judgment or settlement against the wrongdoer.'"[14] Under § 523(a)(19), *all* debts resulting from securities violations, including debts represented by stipulated and default judgments, and debts arising from settlement agreements, are non-dischargeable because Congress eliminated the "actually litigated" prong of the doctrine of issue preclusion for this purpose.[15]

---

[11]   11 U.S.C. §523(a)(19).

[12]   Oklahoma Dept. of Securities v. Wilcox, 691 F.3d 1171, 1175 (10th Cir. 2012).

[13]   Id. at 1175 n.8.

[14]   Cooley-Linder v. Behrends (In re Behrends), 660 Fed. Appx. 696, 700 n.2 (10th Cir. 2016) (citations omitted).

[15]   Section 523(a)(19)(B) "expand[s] the preclusive effect given to the disposition of prepetition securities fraud lawsuits and administrative proceedings so as to make it easier for creditors to obtain nondischargeability determinations, by giving preclusive effect to certain dispositions of matters where securities fraud was at issue, even though the fraud was not 'actually litigated.'" Winkler v. Pierce (In re Pierce), 563 B.R. 698, 705 (Bankr.

In addition, pursuant to an amendment made to § 523(a)(19) in 2005, a debt arising from securities violations need not be reduced to judgment or otherwise liquidated *prior to* the violator's bankruptcy in order to be excepted from discharge.[16] The 2005 amendments "eliminated any requirement that a prepetition judgment exist before the section 523(a)(19) exception to discharge may be applied."[17] Thus, securities regulators and victims of prepetition securities violations may take advantage of the breadth of § 523(a)(19)'s exception from discharge even if the debt is not adjudicated or resolved until after the debtor's bankruptcy.

In order to prevail on a § 523(a)(19) claim on summary judgment, each element must be supported by undisputed facts. First, the record on summary judgment must show that the debtor owes the plaintiff a debt that is *memorialized* by (a) a judgment, order, consent order or decree issued in a state or federal court or administrative proceeding; or (b) a settlement agreement; or (c) a court or administrative order for requiring the debtor to pay the plaintiff damages, fines, penalties, restitution, disgorgement, attorney fees, costs, or other payments. Second, the record must establish that the memorialized debt *resulted from* (a) the debtor's violations of securities laws and/or regulations or (b) the debtor's fraud, deceit, or manipulation in connection with the purchase or sale of any security.

---

C.D. Ill. 2017), *citing* Tripodi v. Welsh, 810 F.3d 761 (10th Cir. 2016). See also Cooley, 660 Fed. Appx. at 700-01.

[16] See Holzhueter v. Groth (In re Holzhueter), 571 B.R. 812, 822 (Bankr. W.D. Wis. 2017).

[17] Id. (quotation marks and citation omitted).

The record herein fails to establish the first element. The debt Plaintiff claims Pentecost owes her resulting from violations of securities laws is not memorialized in a final judgment or order. The ODS memorialized certain preliminary findings and conclusions for the purpose of suspending Pentecost's registration pending a final revocation hearing. Thereafter, Pentecost chose to voluntarily relinquish his license, and the matter between the ODS and Pentecost was resolved without Pentecost admitting any liability to Plaintiff or any debt therefor. Nothing in the Agreement or Consent Order establishes, by stipulation or default, any findings of particular securities violations committed against Plaintiff.[18] The Consent Order does not require Pentecost to pay any damages, restitution, disgorgement, attorney fees or costs to Plaintiff, nor does Pentecost promise to do so in the Agreement.[19] At this point, Plaintiff possesses a *claim* against Pentecost for violations of securities laws and regulations that has not yet been determined or liquidated by any state or federal court or agency.

B.  <u>Pentecost's liability on the Note</u>.

Plaintiff also argues that even if the ODS proceeding is not preclusive, summary judgment is appropriate because Pentecost borrowed money from Plaintiff. She argues that

---

[18]  "[W]here a settlement agreement is inconclusive on the issue of the debtor's culpability, that issue, for dischargeability purposes, must thereafter be litigated to conclusion as contemplated by section 523(a)(19)(B), which permits the litigation to occur 'before, on, or after'" the petition date. <u>Pierce</u>, 563 B.R. at 706.

[19]  See <u>Conway v. Heyl (In re Heyl)</u>, 590 B.R. 898, 903 (B.A.P. 8th Cir. 2018) (a Consent Order between debtor and state securities regulator did not establish any debt to plaintiff, notwithstanding a finding that an unnamed investor (plaintiff) incurred a $79,500 loss from investing with debtor; the order did not provide any form of relief to the plaintiff).

such conduct violates 71 O.S. § 1-502 and Admin. Code Rule 660:11-7-42(b)(6). Pursuant to 71 O.S. § 1-502 –

> A. It is unlawful for a person that advises others, for compensation, either directly or indirectly, or through publications or writings, as to the value of securities or the advisability of investing in, purchasing or selling securities, or that, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities:
>
> 1. To employ a device, scheme, or artifice to defraud another person;
>
> 2. To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading; or
>
> 3. To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.
>
> B. 1. A rule adopted under this act may define an act, practice, or course of business of an investment adviser or an investment adviser representative as fraudulent, deceptive or manipulative, and prescribe means reasonably designed to prevent investment advisers and investment adviser representatives from engaging in acts, practices, and courses of business defined as fraudulent, deceptive, or manipulative.[20]

Rule 660:11-7-42 of the Oklahoma Administrative Code – Standards of ethical practices – provides in pertinent part:

> (a) **Purpose.** This Section is intended to set forth the standards of ethical practices for investment advisers and investment adviser representatives. . . . Any noncompliance with the standards set forth in this Section will constitute unethical practices in the securities business as the same is set forth in Section 1-411.D.13 of the Securities Act; however, the following is not intended to be a comprehensive listing of all specific events or conditions that may constitute such unethical practices. The standards shall be interpreted in such manner as will aid in effectuating the policy and provisions of the Securities

---

[20] 71 O.S. § 1-502(A) and (B)(1).

Act, and so as to require that all practices of investment advisers and investment adviser representatives in connection with their activities in this state shall be just, reasonable and not unfairly discriminatory.

(b) **Standards.** An investment adviser or investment adviser representative shall not engage in dishonest or unethical practices including, although not limited to, the following:

*****

> (6) Borrowing money or securities from a client unless the client is a broker-dealer, an affiliate of the investment adviser or investment adviser representative, or a financial institution engaged in the business of loaning funds.[21]

Pentecost denies that he borrowed money from Plaintiff and asserts that the Note clearly identifies Sonus as the "borrower." Plaintiff contends that Pentecost signed the Note in his personal capacity rather than as an agent of Sonus, and thus, under Section 3-402(b) of the Uniform Commercial Code, as adopted in Oklahoma ("OUCC"), he is personally liable on the Note.[22]

Section 3-402(b) of the OUCC provides that –

(b) If a representative signs the name of the representative to an instrument and the signature is an authorized signature of the represented person, the following rules apply:

> (1) If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument; and

> (2) Subject to subsection (c) of this section, if (i) the form of the signature does not show unambiguously that the signature is made in a representative capacity or (ii) the represented person is not identified in the instrument, the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument. With respect to any other person, the representative is liable on the instrument

---

[21] Okla. Admin. Code 660:11-7-42.

[22] Motion at 4-5, 7.

>unless the representative proves that the original parties did not intend the representative to be liable on the instrument.[23]

Plaintiff asserts that because the "form of the signature [on the Note] does not show unambiguously that the [Pentecost's] signature [was] made in a representative capacity."[24] Pentecost is *prima facie* liable on the Note. Section 3-402(b) provides, however, that a signatory whose representative capacity is not clearly stated is strictly liable *only* to "a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument."[25] Plaintiff is the original payee on the Note, and she dealt directly with the borrower in making the Loan. She is not a holder in due course and therefore she is subject to any defenses Pentecost may have as to liability.

Moreover, Section 3-402(b)(2) of the OUCC provides that "with respect to any other person [*i.e.*, one not a holder in due course without notice of the intent of the parties], the representative is liable on the instrument *unless the representative proves that the original parties did not intend the representative to be liable on the instrument*."[26] In the affidavit attached to the Response, Pentecost states under penalty of perjury that *Sonus* borrowed $45,000 from Plaintiff. The Court finds Pentecost's testimony sufficient to create a genuine issue of material fact. Section 3-402(b)(2) of the OUCC provides Pentecost an opportunity to prove with extrinsic evidence that "the original parties did not intend the

---

[23] 12A O.S. § 3-402(b).

[24] Id., § 3-402(b)(2).

[25] Id.

[26] Id. (emphasis added).

representative to be liable on the instrument."[27] Thus, Plaintiff is not entitled to summary judgment on her claim that Pentecost violated securities laws or regulations by borrowing money from her.[28] At trial, Pentecost will have the burden of proving that the parties did not intend Pentecost to be liable on the Note.

  C. This Court is authorized under § 523(a)(19) to hear and adjudicate Plaintiff's securities claims.

The parties stipulate that Plaintiff's claim for violations of the Oklahoma securities laws and regulations may be tried on the merits in this adversary proceeding,[29] and the Court agrees that it is empowered to do so. Section 523(a)(19)(B) expressly permits post-petition adjudication or settlement of claims arising from violations of securities laws and regulations, and § 523(a)(19)(B)(i) provides that such determinations may be made "in *any*

---

[27] Id. The Oklahoma Comments to OUCC § 3-402 states:

> [A]gainst all persons other than a holder in due course without notice of the intention not to be liable, subsection (b)(2) *will always allow a representative to prove his or her signature on an instrument was made solely in a representative capacity, even if that capacity is not indicated*. This result concurs with prior Oklahoma case law which generously allowed the admission of parol evidence to establish a signatory's true capacity. See Moore v. White, 603 P.2d 1119 (Okla. 1979); Guaranty Nat'l Bank v. Beaver, 738 P.2d 1336 (Okla. 1987).

12A O.S. § 3-402, Oklahoma Comments (emphasis added). See also 2 White, Summers & Hillman, UNIFORM COMMERCIAL CODE § 17:7 (6th ed.).

[28] Plaintiff argues that based on the totality of the evidence, including that Pentecost disclosed the debt on his schedules as his personal liability, and that Pentecost made payments on the Note, "[n]o reasonable trier of fact can make a finding that [Pentecost] did not individually borrow money from Plaintiff." Motion at 7. In ruling on summary judgment, however, the Court is required to take all reasonable inferences in favor of Pentecost and is not permitted to weigh conflicting evidence on this issue.

[29] Motion at 6; Response at 11-12.

Federal or State judicial or administrative proceeding."[30] The statute does not limit adjudications to non-bankruptcy courts.

At trial, Plaintiff will have the burden of proving liability and damages[31] under Oklahoma's securities laws and/or regulations to the same extent as if her claim was presented to an Oklahoma court or agency. If she prevails in establishing liability and damages, the debt memorialized by any judgment entered herein will be excepted from discharge under § 523(a)(19).

## IV. Conclusion

For the reasons set forth above, the Motion is denied. Although summary judgment cannot be granted, the Court concludes that relief under Rule 56(g) of the Federal Rules of Civil Procedure (made applicable herein by Bankruptcy Rule 7056)[32] is warranted. Accordingly, it is hereby **ordered and decreed** that the facts set forth in Section III herein are not genuinely in dispute, and it is **ordered** that these facts are established for the

---

[30] 11 U.S.C. § 523(a)(19)(B)(i) (emphasis added). See also Holzhueter, 571 B.R. at 821-24; Pierce, 563 B.R. at 707; Dorsch v. Butler (In re Butler), 2017 WL 5151678 *7 (Bankr. E.D. Wis. 2017) ("§ 523(a)(19) makes clear that the judgment or order can be entered after the petition by any Federal or State judicial proceeding, and the better-reasoned cases include the bankruptcy court in the universe of Federal judicial proceedings that can make this determination").

[31] See Oklahoma Dept. of Securities v. Wilcox, 691 F.3d 1171, 1174 (10th Cir. 2012).

[32] Rule 56(g) provides:

> If the court does not grant all the relief requested by the motion [for summary judgment], it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case.

Fed. R. Civ. P. 56

purpose of trial. The parties are **ordered** to *itemize* each undisputed material fact set forth herein in the proposed joint pretrial order that is to be submitted to the Court. To be clear, the factual findings issued by the Enforcement Attorneys and the Administrator in the ODS administrative proceeding were not finally adjudicated, and thus are not considered undisputed facts in this proceeding.

    **SO ORDERED** this 5th day of August, 2021.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT