## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 20-10651-R** |
| **PENTECOST, Claude Daniel Jr.,** | ) | **Chapter 7** |
| **PENTECOST, Jean Rae,** | ) | |
| | ) | |
| **Debtors.** | ) | |
| _____ | ) | |
| | ) | |
| **WANDA G. BERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Adv. No. 20-1039-R** |
| | ) | |
| **CLAUDE DANIEL PENTECOST,** | ) | |
| **JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Filed/Docketed
Dec 30, 2021

## <u>MEMORANDUM OPINION</u>

This matter came before the Court for a trial on the merits of the Complaint filed by Plaintiff Wanda G. Berry against Defendant/Debtor Claude Daniel Pentecost, Jr.  Upon consideration of the testimony and exhibits admitted at trial, the record in this adversary proceeding and in Mr. Pentecost's bankruptcy case, arguments of counsel, and applicable law, the Court makes the following findings of fact and conclusions of law:

## I.     Jurisdiction

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I), and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.    Contentions of the parties

Ms. Berry, a widow in her nineties, brought this action against Mr. Pentecost, her long-time financial advisor seeking to except from discharge certain debts that arose from Mr. Pentecost's handling of Ms. Berry's money. First, Ms. Berry contends that Mr. Pentecost borrowed $45,000 of her retirement savings, counter to his fiduciary duties and in violation of Oklahoma's securities laws, and never repaid the loan. Second, she contends that Mr. Pentecost duped her into investing $50,000 in a highly speculative and unsuitable limited partnership that Mr. Pentecost promoted, managed, and operated, again in violation of his fiduciary duties and securities laws. She seeks to have her claims liquidated and declared non-dischargeable under Sections 523(a)(4) and (a)(19) of the Bankruptcy Code.[1]

Mr. Pentecost claims that he is not liable on the note evidencing the $45,000 loan because he signed note as managing member of a limited liability company and not in his personal capacity. With respect to the limited partnership investment, Mr. Pentecost asserts that Ms. Berry authorized the transaction and denies that it was an unsuitable investment for her.

In pretrial proceedings, Mr. Pentecost moved to dismiss the § 523(a)(4) claim as untimely. The Court denied the motion and reserved for trial the issue of whether the filing deadline was equitable tolled. Later, Ms. Berry moved for summary judgment on her § 523(a)(19) claim. That motion was denied because her claims for securities violations had

---

[1] Unless otherwise specified, all references to "Section" or "§" are to sections of the Bankruptcy Code, title 11 of the United States Code.

not yet been reduced to judgment, order, or settlement agreement as required by § 523(a)(19).

## III.   Findings of fact

### A.   Relationship of the Parties

Mr. Pentecost was a financial adviser acting through his wholly-owned corporation, Pentecost Capital Management, Inc. Mr. Pentecost and his company were registered investment advisers under the Oklahoma Uniform Securities Act of 2004, 71 O.S. §§ 1-101 through 1-701 (the "Act"), and therefore were bound to comply with the Act and the rules and regulations promulgated thereunder.

For many years, Mr. Pentecost managed the investments of Ms. Berry and her late husband. When Mr. Berry passed away in 1999, Ms. Berry placed her life savings in a single Charles Schwab account ("Schwab Account"), retained Mr. Pentecost as her investment adviser, and granted Mr. Pentecost a limited power of attorney giving him discretionary authority to select and execute investment transactions for Ms. Berry's benefit.[2] Mr. Pentecost admits that as an investment adviser, he owes fiduciary duties to his client, Ms. Berry.[3] A such, he had an affirmative duty to act in utmost good faith in giving Ms. Berry disinterested advice and providing full and fair disclosure of all material facts, as well as the duty to manage her funds for her sole benefit.[4]

---

[2] Plaintiff's Exhibit 13.

[3] Trial Transcript (Adv. Doc. 27) ("Tr.") at 27.

[4] SEC v. Cap. Gains Rsch. Bureau, Inc., 375 U.S. 180, 194 (1963).

Admittedly not a sophisticated investor, Ms. Berry relied exclusively on Mr. Pentecost to select investments that were safe and appropriate for her age, risk tolerance, and financial needs.[5]  At the time of trial, Ms. Berry was 93 years old and lived alone in a recently purchased home encumbered by a mortgage.[6] Ms. Berry's fixed monthly income of approximately $2,900 was comprised primarily of Social Security benefits and her survivor's share of her husband's pension.[7]  To pay her general living expenses, Ms. Berry relied upon monthly withdrawals from the Schwab Account that Mr. Pentecost managed.

Mr. Pentecost is the only financial adviser Ms. Berry has ever had.[8] Ms. Berry did not understand much of what Mr. Pentecost told her orally or in writing concerning her investments,[9] but she trusted him to recommend and execute transactions that were in her best interests.

   B.    The Loan

In 2015, Mr. Pentecost confided in Ms. Berry of his "need for some extra money,"[10] and asked Ms. Berry to loan him $45,000.[11] After some thought, Ms. Berry "decided that

---

[5] Tr. at 143-47.

[6] Plaintiff's Exhibit 11.

[7] Tr. at 24, 165.

[8] Tr. at 143.

[9] Tr. at 145-46.

[10] Tr. at 149.

[11] Id.  In a discovery response, made under penalty of perjury, Ms. Berry stated that Mr. Pentecost described the loan as "a minor emergency loan" and represented that "he would lose his business without her loan and that he would pay it back in a short amount of time (e.g., two-to-three months) or 'on demand.'"  Plaintiff's Exhibit 17 at 8, ¶ 4.

because of our past history and our friendship, I would loan him the money."[12] She testified that she "was not thrilled about it, but I did not hesitate to do it when we finally made our decision."[13] Ms. Berry stated: "I know that in the course of our conversation I told him that I could not afford to lose that money and I was doing it because I felt he was a man of honor and would pay me back."[14]

To document the loan, Mr. Pentecost drafted an Unsecured Promissory Note (Demand) (the "Note") dated May 27, 2015, wherein the "Borrower" promised to repay Ms. Berry $45,000, together with interest at an annual rate of 10.5%, on or before July 10, 2015.[15] The "Borrower" is defined in the Note as "C Dan Pentecost, as managing partner, Sonus Rights Management LLC."[16] Mr. Pentecost signed the Note in what appears to be his personal capacity—that is, the signature block lacks any indication that he signed as a representative of Sonus Rights Management LLC ("Sonus"). Then Mr. Pentecost, using his power of attorney, caused Ms. Berry to liquidate securities and to borrow against other assets in her Schwab Account[17] to generate the cash needed to fund the $45,000 loan to himself and/or his affiliated entity, Sonus.[18]

---

[12] Id.

[13] Id.

[14] Id.

[15] Plaintiff's Exhibit 1.

[16] Id.

[17] Tr. at 26-27.

[18] Sonus was owned, at least in part, by Mr. Pentecost, and Mr. Pentecost was a managing member.  In his bankruptcy schedules, Mr. Pentecost claimed a 100% ownership interest in Sonus. Plaintiff's Exhibit 15 at 16 of 75. At trial, he claimed that he was one of three equal members of the entity, the other two being his son and a "music-publishing

Throughout this proceeding, Mr. Pentecost has taken the position that he is not personally liable to Ms. Berry for repayment of the loan because, in his mind, he signed the Note in his representative capacity on behalf of Sonus. Ms. Berry testified that she agreed to loan money *to Mr. Pentecost* to help him with his financial problems. Mr. Pentecost did not tell Ms. Berry that he did not intend to be legally obligated on the Note, or that repayment would depend on the success or failure of Sonus.[19] Ms. Berry testified that she would not have extended the loan to a business entity.[20]

Regardless of whether Mr. Pentecost is liable on the Note or not, it is undisputed that he solicited a sizable loan from Ms. Berry for his own benefit and contrary to Ms. Berry's best interests. At the time of the loan, Sonus was a startup entity with no assets, no revenue, and no business history.[21] According to Mr. Pentecost, Sonus's "long term goal" was to "raise money from other private equity funds" and "prospect and acquire . . . music publishing catalogs."[22] Sonus's first acquisition was to be an established company called Q-Factory.[23] Mr. Pentecost's son "came up with the concept" and asked Mr. Pentecost to "be a managing partner and to help facilitate the formation and the development of

---

executive." Tr. at 31, 73-74, 78. In any event, Mr. Pentecost owned a significant equity interest in Sonus and stood to benefit from a cash infusion into Sonus.

[19] Tr. at 150-51.

[20] Id.

[21] Tr. at 24-25. Mr. Pentecost testified that he told Ms. Berry that the loan was "to provide the wherewithal for the startup, Sonus Rights Management. . . . to establish and market Sonus. . ." Tr. at 20.

[22] Tr. at 75.

[23] Id.

Sonus."[24] Mr. Pentecost testified that he used the proceeds of the loan to travel to Chicago, Boston, and New York City to meet with prospective private equity funders in an effort to raise $8 million to purchase Q-Factory.[25] Sonus did not succeed in raising the funds, however, and ultimately, Sonus was dissolved.[26]

In soliciting the loan, Mr. Pentecost did not provide Ms. Berry with any written disclosure regarding Sonus's financial condition or her risk of loss.[27] Nor did he disclose that his material conflict of interest meant that he could not give her unbiased advice about the wisdom of liquidating assets in her Schwab Account to loan money to him or Sonus.[28] Nor did he advise her to seek independent legal or financial advice regarding the terms of the Note or the propriety or suitability of lending money to fund her financial adviser.[29]

No payments to Ms. Berry have been made on the Note.[30]

---

[24] Tr. at 78.

[25] Tr. at 77-78.

[26] Id.

[27] Tr. at 118.

[28] Mr. Pentecost testified that he did not view the transaction as raising any conflicts of interest.  Tr. at 35-36.

[29] Tr. at 25-26.

[30] Ms. Berry testified that there were "no repayments on the note at all from anyone."  Tr. at 161. Mr. Pentecost thought he made one payment "in the neighborhood of $1,500," but he could not recall when or how the payment was made, and no documentation of such a payment is in evidence. Tr. at 33-34.  In late July of 2020, Mr. Pentecost sent Ms. Berry a check in the amount of $1,000, but his bank returned the check unpaid because it was written on a closed account. Tr. at 58-61; Plaintiff's Exhibit 10. Mr. Pentecost claimed that he intended to give Ms. Berry $2,000 in cash after the $1,000 check bounced, but by then Ms. Berry had ceased all contact with him. Tr. at 62-63.

C.      The Limited Partnership

In 2018, Mr. Pentecost advised Ms. Berry to invest in PMP Investors I, LP ("PMPII"), an Oklahoma limited partnership formed by Mr. Pentecost.  By selling limited partnership interests, Mr. Pentecost sought to raise $2,000,000 in venture capital to be used to purchase a 23% interest in a company that intended to purchase the assets of Q-Factory.[31]

To that end, Mr. Pentecost presented for Ms. Berry's signature a 36-page document that included a Confidential Private Placement Memorandum ("Memorandum"), a Subscription Agreement, and a Limited Partnership Agreement.  Mr. Pentecost "played a significant role" in drafting the Memorandum[32] and promoted himself as experienced in developing, exploiting, and selling music publishing catalogs.[33] Ms. Berry did not recall Mr. Pentecost reviewing the contents of the documents with her, nor did she understand his explanation of the investment.[34] Relying on Mr. Pentecost's advice, she signed the Subscription Agreement and the Limited Partnership Agreement, thereby committing to invest $50,000 in PMPII.[35]  With his signature as the manager of the general partner of PMPII, Mr. Pentecost "received and accepted" the agreements.[36]

---

[31] Defendant's Exhibit 1; Tr. at 90-91. In her discovery responses, Ms. Berry explained, under penalty of perjury, that she and Mr. Pentecost had discussed that he was soliciting investors for Q-Factory and that he "spoke often of clients who were investing $100,000 each. . . . It was an ongoing conversation . . . and after a period of time, [Mr. Pentecost] indicated it might be wise" for Ms. Berry to invest $50,000. Plaintiff's Exhibit 17 at 9, ¶ 6.

[32] Tr. at 131.

[33] Defendant's Exhibit 1 at 3.

[34] Tr. at 146.

[35] Defendant's Exhibit 1 at A-3, B-16.

[36] Id.

According to the Memorandum, the securities were to be offered "to a limited number of individuals or entities meeting certain suitability standards," because the offering "involve[d] risk," and investors could "sustain a loss of their entire investment."[37] At the time Mr. Pentecost had Ms. Berry commit to purchase the "highly speculative"[38] limited partnership interest, PMPII had no assets, no revenue, and no operational history. Further, its prospective acquisition of Q-Factory was dependent on obtaining $4.25 million in long-term bank debt, $1.75 million in convertible debt, and $1.7 million in "seller equity" to provide working capital.[39]

In June 2018, Mr. Pentecost facilitated Ms. Berry's purchase of an interest in PMPII. Pursuant to his limited power of attorney, Mr. Pentecost liquidated securities in the Schwab Account to generate approximately $39,000 in cash, and caused Ms. Berry to borrow the remainder of the $50,000 purchase price on margin.[40] He then wired funds from the Schwab Account to Ms. Berry's Arvest checking account from which she issued a check payable to PMPII, noting "Q-Factory" in the memo line.[41]

---

[37] Id. at II (all caps omitted).

[38] Id. at I (all caps omitted).

[39] Id. at 6.

[40] Exhibit C attached to Plaintiff's Exhibit 11.

[41] Id. See also Plaintiff's Exhibit 19-B. The amount wired from the Schwab Account was actually $50,015, and the check payable to PMPII was also $50,015. The Court assumes the additional $15 was an administrative fee. In addition, a $25 wire transfer fee was charged and deducted from Ms. Berry's Schwab Account in connection with the transaction.

PMPII raised $1.6 million in the private offering[42] and acquired a 23% interest in a new entity called 2017 Q-Factory, LLC ("2017 Q-Factory").[43] The remaining interests in 2017 Q-Factory were acquired by the founder/seller of the original Q-Factory, and by Phoenix Music Publishing, LLC, an entity in which Mr. Pentecost holds a substantial interest.[44]   In order to purchase its 2017 Q-Factory interest, PMPII also incurred $1.6 million in short-term convertible debt[45] and $4 million (more or less) in long-term financing.[46]

According to Mr. Pentecost, "[i]mmediately upon establishing the company in 2018," problems arose in the industry and the expected returns did not materialize.[47] In 2019, Mr. Pentecost waived his management fee and the company laid off most of its employees.[48]   At the time of trial, the short-term high-interest-rate debt was past due, and Mr. Pentecost was entertaining third-party offers to purchase the project, but no offer had been sufficient to provide any return to investors like Ms. Berry.[49]

---

[42] Tr. at 128.

[43] Tr. at 136.

[44] Tr. at 131.  In his bankruptcy schedules, Mr. Pentecost represented that he owned 100% of 2017 Q-Factory, LLC, but at trial, he admitted that was another mistake. See Plaintiff's Exhibit 15 at 15 of 75.

[45] Tr. at 137.

[46] See Defendant's Exhibit 1 at 6; Plaintiff's Exhibit 2 at 33-34 of 75 (debts to First Tennessee Bank); Plaintiff's Exhibit 16 (co-debtors on First Tennessee Bank debt); Plaintiff's Exhibit 5, ¶¶ 5, 6, 15, 18 (same debt, now owed to Horizon Bank).

[47] Tr. at 137.

[48] Tr. at 139-40.

[49] Tr. at 138.

At trial, Mr. Pentecost attempted to justify PMPII as a suitable investment for Ms. Berry because "she was not relying *solely* on" her Social Security and pension income, and she had been getting "greater than 20 percent annual compound return from her equity investment portfolio [in the Schwab Account] to provide income."[50]  Yet he advised Ms. Berry to take $50,000 *out* of the well-performing Schwab Account to purchase a "highly-speculative" investment for which he acted as promoter, issuer, organizer, general partner, manager, and investment adviser, and from which he expected to earn management fees and commissions.

      D.    <u>Timeliness of the Complaint</u>

Mr. Pentecost filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code on April 16, 2020. On his schedules, he represented that he owed Ms. Berry $35,000 as a result of a "Personal Loan" extended in 2019.[51]

Whether Ms. Berry timely filed her Complaint depends upon, among other things, whether she received proper notice of the last day a creditor could file a complaint seeking to except a debt from discharge. In his schedules, Mr. Pentecost listed Ms. Berry's address as xxxxx South 94th Place East, Tulsa, OK (the "94th Place Address"), and acknowledged, by signing the "Verification as to Official Creditor List," that the bankruptcy court would rely on that address when sending notices to her.[52]  The Clerk of this Court generated a

---

[50] Tr. at 39-41.

[51] Plaintiff's Exhibit 2 at 38 of 75. Mr. Pentecost admits that the representation is inaccurate in myriad particulars, including who owes the debt (*i.e.*, Mrs. Pentecost is not liable), the date the debt was incurred (2015), and the amount of debt ($45,000, plus five years of interest at 10.5%). In addition, he failed to indicate that he disputed that he owed the debt.

[52] Main Case Doc. 1 at 70 of 75.

standard Notice of Chapter 7 Bankruptcy Case ("Notice") that, among other things, set July 20, 2020, as the last day to timely file a complaint seeking to except a debt from discharge.[53] The Notice was mailed to Ms. Berry at the 94th Place Address.[54]

Although Ms. Berry resides at the 94th Place Address, she rents a private locked mailbox located inside a commercial mailing center on 101st Street in Tulsa, and has historically directed everyone she does business with, including Mr. Pentecost, to address her mail to the private mailbox (the "101st Street Address").[55] She does this because she does not believe her residence mailbox is secure.[56] Because all substantive mail is directed to the 101st Street Address, Ms. Berry does not routinely collect or open the junk mail delivered to her residence mailbox. She testified that she empties her residence mailbox occasionally "so that the postman can stuff more stuff in."[57]

Without a doubt, Mr. Pentecost knew that Ms. Berry received her mail at the 101st Street Address.  For years, he sent his quarterly reports to her at the 101st Street Address. It is Ms. Berry's noticing and mailing address for the Schwab Account that Mr. Pentecost manages. It is also Ms. Berry's noticing address on the Note that Mr. Pentecost himself drafted.[58]  Yet when listing the debt represented by the Note on his bankruptcy schedules,

---

[53] Main Case Doc. 7.

[54] Main Case Doc. 8.

[55] Tr. at 147-48. Ms. Berry testified that she "insist[s], if I'm able to insist, to the person that could be sending mail, not to use the home address, to send it to [the 101st Street Address]." Tr. at 164.

[56] Tr. at 148.

[57] Tr. at 163.

[58] Plaintiff's Exhibit 1, ¶ 9.

Mr. Pentecost ignored the explicit notice language of the Note, and chose instead to divert notice of his bankruptcy, and his intent to discharge the Note, to Ms. Berry's residence mailbox.[59]   The Court finds that Mr. Pentecost deliberately misdirected notices from the bankruptcy court in order to prevent Ms. Berry from asserting her rights as a creditor.

Ms. Berry did not learn of Mr. Pentecost's bankruptcy until July 7, 2020, when Mr. Pentecost, in a phone call, told her that he had filed.[60] Ms. Berry testified that he assured her that "his bankruptcy would not impact the investments I have with him and the loan I made to him."[61] On July 10, 2020, Ms. Berry and Mr. Pentecost met in his office, with Ms. Berry's granddaughter, Rachel, attending by telephone. Mr. Pentecost again represented to Ms. Berry and Rachel that the loan would not be affected by his bankruptcy.[62]

The Court finds that Mr. Pentecost schemed to personally control the information Ms. Berry received about the effect of his bankruptcy on her rights. His assurances dissuaded her from timely seeking independent advice.

E.   Proceedings before the Oklahoma Securities Commission

Under the Oklahoma Securities Act, insolvency is potentially grounds for discipline of a registered financial adviser. Upon learning of Mr. Pentecost's bankruptcy filing, the Oklahoma Department of Securities ("ODS") opened an investigation and initiated an administrative proceeding against Mr. Pentecost. Because Ms. Berry was a client of Mr.

---

[59] Mr. Pentecost would only admit that Ms. Berry "expressed a preference" that her statements be sent to the 101st Street Address, stating that "I don't recall her ever saying you can't use my residential address." Tr. at 94-95.

[60] Plaintiff's Exhibit 11 at ¶ 17; Tr. at 170.

[61] Plaintiff's Exhibit 11 at ¶ 17.

[62] Id.; Tr. at 171.

Pentecost and was listed on Mr. Pentecost's bankruptcy schedules as an unsecured creditor, the ODS contacted Ms. Berry.

On August 3, 2020, the ODS Enforcement Division issued detailed proposed findings of fact and conclusions of law outlining certain unethical practices Mr. Pentecost used in advising Ms. Berry, and recommended that his registration as an investment adviser be immediately suspended (the "Recommendation").[63] The Administrator of the ODS adopted the Recommendation, preliminarily found that Mr. Pentecost was insolvent and that he violated his fiduciary duties to Ms. Berry, and entered an order summarily suspending Mr. Pentecost's registration pending a final hearing.[64] Instead of contesting the ODS's findings, Mr. Pentecost voluntarily forfeited his registration pursuant to an Agreement and Consent Order.[65]  Although the ODS's findings and conclusions did not result in a final order, the interim order did serve as notice to Ms. Berry that Mr. Pentecost may have violated statutory and fiduciary duties in connection with her loan and in recommending and facilitating unsuitable investments.

F.    Credibility of the witnesses

Mr. Pentecost has not been honest with Ms. Berry or the Court.  As noted herein and in the Order Denying Plaintiff's Motion for Summary Judgment, Mr. Pentecost's bankruptcy schedules and statement of financial affairs are rife with inconsistencies, material omissions, and inaccurate statements.[66] Ms. Berry's Complaint, filed in August

---

[63] Plaintiff's Exhibit 7.

[64] Plaintiff's Exhibit 6.

[65] Plaintiff's Exhibits 8 and 9.

[66] Adv. Doc. 20 at 4 n.8.

2020, identified various inaccuracies related to his debt to her.[67] Mr. Pentecost confirmed these inaccuracies in his discovery responses, and at trial when examined by Ms. Berry's counsel.[68] Mr. Pentecost's schedules also conflicted with his discovery responses and his testimony at trial as to his interests in certain entities.[69] Mr. Pentecost still has not corrected errors in the original schedules that he signed under penalty of perjury.

Mr. Pentecost's testimony at trial was evasive and internally inconsistent. He was loath to concede that Ms. Berry was not a sophisticated investor, or that she needed or relied upon his advice in making the loan and investing in PMPII. His explanation of the PMPII investment was vague and imprecise, and inconsistent with the Memorandum and Limited Partnership Agreement.[70] In sum, Mr. Pentecost has consistently shown a reckless indifference to his obligation to be truthful in making representations under oath.

For her part, Ms. Berry testified to the best of her ability, was honest and forthright, and readily admitted to lapses in her recollection of dates, chronologies, and the details of

---

[67] Adv. Doc. 1 at 3-4, ¶¶ 11-13.

[68] Tr. at 49-55; Plaintiff's Exhibit 4 at ¶¶ 11-13.

[69] For example, in his bankruptcy schedules, Mr. Pentecost represented that he was the sole member of Sonus. Plaintiff's Exhibit 15 at 16 of 75. At trial, he testified that he was one of three members of Sonus.  Tr. at 31, 56. In a discovery response, he denied currently owning any interest in Sonus. Plaintiff's Exhibit 4, ¶ 17.

As another example, in his testimony, Mr. Pentecost claimed to own an interest in Phoenix Music Publishing, LLC, with two other gentlemen. Tr. at 130. In an interrogatory response, he failed to include Phoenix Music Publishing, LLC, in the list of entities in which he owned an interest. Plaintiff's Exhibit 5, ¶ 1.

Mr. Pentecost also represented in his schedules that he owned 100% of 2017 Q-Factory, LLC (Plaintiff's Exhibit 15 at 16 of 75), but at trial he testified that PMPII owns 23% of 2017 Q-Factory (Tr. at 136), and that he does not own any interest in that entity (Tr. at 131).

[70] Tr. at 128-38.

15

conversations. The Court found Ms. Berry a credible witness.  Rachel's testimony was also clear, precise, consistent, and credible.

## IV.    Conclusions of law

A.    <u>Equitable tolling</u>

It is undisputed that Ms. Berry did not file her Complaint prior to the deadline for challenging the discharge of certain debts, but she contends that the limitations period should be equitably tolled. The Court concludes that equitable tolling is appropriate under the extraordinary circumstances of this case.

Bankruptcy Rule 4007(c) sets the limitations period for filing a complaint under § 523(a)(4). It provides that such a complaint "shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a)."[71] The last day to file a complaint against Mr. Pentecost was July 20, 2020. Ms. Berry filed her Complaint on August 13, 2020, less than a month after the deadline, and ten days after the ODS issued its order summarily suspending Mr. Pentecost's license for, among other things, breaching fiduciary duties to Ms. Berry.

The doctrine of equitable tolling "is read into every federal statute of limitation."[72] Parties invoking the doctrine have the burden of establishing equitable cause for tolling the limitations period.[73]

> Equitable tolling may be appropriate "when the defendant's conduct rises to the level of active deception; where a plaintiff has been lulled into inaction by a defendant, [or] ... 'if a plaintiff is actively misled or has in some

---

[71] Fed. R. Bankr. P. 4007(c).

[72] <u>Holmberg v. Armbrecht</u>, 327 U.S. 392, 397 (1946).

[73] <u>McNaughton v. Maytorena (In re Maytorena)</u>, 2011 WL 5509194 at *7 (Bankr. D. N.M.).

extraordinary way been prevented from asserting his or her rights.'" A court may find that equitable tolling applies to extend the deadline for an otherwise untimely cause of action if a plaintiff shows: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way."  Other factors relevant to the determination of whether equitable tolling applies to extend the deadline for an otherwise untimely cause of action include:

> (1) lack of actual notice of filing requirement; (2) lack of constructive knowledge of filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the notice requirement.[74]

Mr. Pentecost deceived and manipulated Ms. Berry in various ways to prevent her from challenging his intent to discharge his liability to her. First, he directed all notices that Ms. Berry would receive from the Court *away* from the private mailbox where he knew Ms. Berry received her substantive mail. Due process mandates that notice be reasonably calculated to apprise a creditor of the bankruptcy case in time to object to dischargeability of the creditor's claim.[75]  "When a debtor does not afford a creditor due process, either by failing to timely schedule a creditor or by scheduling it incorrectly, the creditor's right to object to the dischargeability of a debt cannot be time-barred under Fed. R. Bankr. P. 4007(c)."[76] A creditor that becomes aware of the bankruptcy prior to the expiration of the Rule 4007(c) deadline, however, has a duty to act promptly to protect its rights.[77]

---

[74] Id. at **7-8 (footnotes and citations omitted). See also Dennie v. Ochs (In re Ochs), 608 B.R. 252 (Bankr. D. Colo. 2019) (discussion of the non-jurisdictional nature of Rule 4007(c) deadline and the elements of equitable tolling).

[75] See In re Schicke, 290 B.R. 792, 800 (B.A.P. 10th Cir. 2003), *citing* Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950).

[76] Id.

[77] Id.

In July 2020, shortly before the Rule 4007(c) deadline lapsed, Mr. Pentecost revealed his bankruptcy filing to Ms. Berry orally and on his own terms, and made false promises and assurances to frustrate her ability to assert her rights as a creditor. Because Ms. Berry trusted Mr. Pentecost to act in her best interests, as she was entitled to do, she reasonably relied on his assurances that his bankruptcy had *no* effect on the debt he owed her. Mr. Pentecost successfully "lulled [Ms. Berry] into inaction" long enough for the complaint deadline to expire.[78]

When the ODS informed Ms. Berry that Mr. Pentecost intended to discharge his liability on the Note, Ms. Berry promptly obtained legal assistance. From the Recommendation and Order issued on August 3, 2020, Ms. Berry learned that Mr. Pentecost violated his fiduciary duties by borrowing money from her and recommending unsuitable investments. Ms. Berry then acted diligently in pursuing her rights, filing her Complaint ten days later.

Tolling the filing deadline from July 20, 2020 to August 13, 2020, is equitable in light of Mr. Pentecost's active role in frustrating Ms. Berry's ability to assert her rights as a creditor in his bankruptcy proceeding. Further, Mr. Pentecost has not established that the short extension of time to file the Complaint has undermined his ability to mount a defense or otherwise prejudiced his rights.

Ms. Berry has met her burden of establishing "extraordinary circumstances" that justify the application of equitable tolling, and therefore the Court concludes that Ms. Berry's § 523(a)(4) claim was timely filed.

---

[78] <u>Maytorena</u>, 2011 WL 5509194 at *7.

B.      Section 523(a)(4)

Section 523(a)(4) excepts from discharge "any debt for fraud or defalcation while acting in a fiduciary capacity."[79] Section 523(a)(4) does not apply to every situation where a person that possesses and exercises fiduciary duties causes harm.  Courts have narrowed the scope of the discharge exception to apply only to debts for losses caused by trustee-type fiduciaries—that is, a fiduciary that wields power over particular property. The first threshold inquiry, then, is whether Mr. Pentecost is the type of fiduciary contemplated by § 523(a)(4).

Under Tenth Circuit precedent, "[t]o find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was *entrusted to the debtor*,"[80] and that the debtor abused that trust.[81] "Further, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy."[82]

The fiduciary relationship between Mr. Pentecost and Ms. Berry arose when Ms. Berry entrusted her investment funds to Mr. Pentecost to manage and invest for her sole benefit.  Ms. Berry seeks to recover the funds she entrusted to Mr. Pentecost that were lost

---

[79] 11 U.S.C. § 523(a)(4).

[80] Fowler Bros. v. Young (In re Young), 91 F.3d 1367, 1371 (10th Cir. 1996) (emphasis added).

[81] See id., *citing* Allen v. Romero (In re Romero), 535 F.2d 618, 621 (10th Cir. 1976) ("fiduciary capacity" as used in § 523(a)(4)'s predecessor requires a relationship "of trust or confidence, which ... arises whenever one's property is placed in the custody of another"); Van De Water v. Van De Water (In re Van De Water), 180 B.R. 283, 289-90 (Bankr. D. N.M. 1995) (debt arising when "the debtor had been entrusted with property of another and then abused that trust" may be excepted from discharge under § 523(a)(4)).

[82] Id., *quoting* Romero, 535 F.2d at 621.

19

on account of his breach of trust. The Court concludes that the fiduciary relationship between Mr. Pentecost, as a trustee-type fiduciary, and Ms. Berry, as the intended beneficiary of Mr. Pentecost's management of her Schwab Account, is within the scope of § 523(a)(4).

The second threshold inquiry is whether Mr. Pentecost's actions were of the type condemned by § 523(a)(4), *i.e.,* did his actions constitute defalcation or fraud while acting in his fiduciary capacity with respect to Ms. Berry's investment funds. The meaning and scope of the term "defalcation" was considered and settled by the United States Supreme Court in <u>Bullock v. BankChampaign, N.A.</u>[83]   In that case, the debtor was a non-professional trustee—the son of the trustor and brother of the beneficiaries—of a trust that held a life insurance policy.[84]  On various occasions, the debtor borrowed against the policy (which was permitted by the trust agreement) and used the funds to purchase property for himself and his mother, all of which he repaid with interest.[85]  Later, the debtor's siblings obtained a state court judgment against the debtor for breaching the fiduciary duty against self-dealing, which required the debtor to divest all benefits derived from the borrowed funds.[86] The debtor filed bankruptcy, and discharge of the judgment was challenged under § 523(a)(4).[87]  Neither the state court nor the bankruptcy court found that the debtor

---

[83] 569 U.S. 267 (2013).

[84] <u>Id</u>. at 269.

[85] <u>Id</u>. at 269-70.

[86] <u>Id</u>. at 270.

[87] <u>Id</u>.

knowingly or intentionally violated his duties to the beneficiaries, but the bankruptcy court excepted the debt from discharge nevertheless.[88]

The Supreme Court reversed and remanded, holding that a debt arising from a trustee's defalcation cannot be excepted from discharge under § 523(a)(4) without a finding of scienter, *i.e.*, that the debtor was conscious of the wrongfulness of his behavior or consciously disregarded the risk that the behavior was wrongful.[89]  Negligence or innocent mistake in handling trust property does not rise to defalcation. Instead, a creditor must establish that the debtor had "knowledge of or gross recklessness in respect to, the improper nature of the fiduciary behavior"[90] or that the debtor "consciously disregard[ed] (or [was] willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty."[91]

The Court notes, at this point, that unlike the non-professional trustee in Bullock, Mr. Pentecost was an experienced and regulated investment adviser. The fiduciary nature of the relationship between investment advisers and their clients has been long recognized. Federally, Congress enacted the Investment Advisers Act of 1940 to protect investors by

---

[88] Id.

[89] Id. at 273-75.

[90] Id. at 269.

[91] Id. at 274.  Excepting a debt arising from "*fraud . . . while acting in a fiduciary capacity*" also has a scienter requirement.  Id. at 274-75.

See also In re Karch, 499 B.R. 903, 907 (B.A.P. 10th Cir. 2013) (applying the Bullock standard, the bankruptcy appellate panel held that "in order to hold a debt non-dischargeable under § 523(a)(4), a bankruptcy court must find that the debtor acted with wrongful intent, or, at a minimum, with a conscious disregard of his or her fiduciary duties.")

"substitut[ing] a philosophy of full disclosure for the philosophy of caveat emptor . . . to achieve a high standard of business ethics in the securities industry."[92] "The Investment Advisers Act of 1940 thus reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship,' as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline [an] investment adviser—consciously or unconsciously—to render advice which was not disinterested."[93] An investment adviser has "an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' his clients."[94]

Oklahoma regulations that apply to investment advisers describe specific types of behaviors that are deemed to be dishonest and unethical, *i.e.,* violative of an investment adviser's fiduciary duties of honesty, care, and loyalty.  Sanctionable conduct includes:

> (1) Recommending to a client to whom investment supervisory, management or consulting services are provided the purchase, sale or exchange of any security without reasonable grounds to believe that the recommendation is suitable for the client on the basis of information furnished by the client after reasonable inquiry concerning the client's investment profile.
>
> > (A) A client's investment profile includes, but is not limited to, the client's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information disclosed by the client or known to the investment adviser or investment adviser representative.

---

[92] <u>SEC v. Cap. Gains Rsch. Bureau, Inc.</u>, 375 U.S. 180, 186 (1963).

[93] <u>Id.</u> at 191-92 (citations omitted).

[94] <u>Id.</u> at 194 (citations omitted).

\*\*\*\*\*

(6) Borrowing money or securities from a client unless the client is a broker-dealer, an affiliate of the investment adviser or investment adviser representative, or a financial institution engaged in the business of loaning funds.

\*\*\*\*\*

(11) Failing to disclose to clients in writing before any advice is rendered any material conflict of interest relating to the investment adviser or any of its employees which could reasonably be expected to impair the rendering of unbiased and objective advice.[95]

Laws regulating trustees impose similar fiduciary duties when handling and investing trust funds. For example, under Oklahoma's Uniform Prudent Investor Act, a "trustee shall invest and manage the trust assets solely in the interest of the beneficiaries."[96] "The foundation for this section is the duty of loyalty which prohibits the trustee from engaging in self-dealing or administering the trust in the interest of any parties who are not beneficiaries."[97]

These statutory fiduciary duties are derived from the common law. Under common law, a fiduciary owes a duty of prudence, defined as the exercise of reasonable care and

---

[95] Okla. Admin. Code 660:11-7-42.

[96] 60 O.S. § 175.65. Oklahoma adopted the Uniform Prudent Investor Rule, which was derived primarily from the RESTATEMENT (THIRD) OF TRUSTS: PRUDENT INVESTOR RULE § 170 (1992).

[97] 60 O.S. § 175.65 cmt. See also Oklahoma Bar Ass'n v. Clausing, 224 P.3d 1268, 1276 (Okla. 2009) (Attorney for trust violated fiduciary duties by borrowing trust funds without obtaining affirmative consent of beneficiaries or advising them to seek independent legal advice; he impermissibly used information obtained from representation of the trust to further his own interests, borrowed money from the trust for a business transaction for his own personal gain, and thus created a conflict of interest between his fiduciary duties and his personal interests).

skill, the duty to act with a degree of caution suitable under the circumstances,[98] as well as a duty of loyalty, which includes acting solely in the interests of the beneficiary, strict avoidance of self-dealing or other conduct that creates a conflict between a trustee's fiduciary duties and the trustee's personal interests, and full disclosure of all material facts.[99]

The Court will apply the above legal principles to determine whether Mr. Pentecost committed fraud or defalcation in his capacity as a fiduciary with respect to the two investments at issue –the Note and the Limited Partnership Interest.

> 1. *The Note*

In 2015, Mr. Pentecost told his client, Ms. Berry, that he was in financial distress and needed "some extra money,"[100] specifically $45,000. In his own telling, Mr. Pentecost needed the funds to travel around the country seeking venture capital for Sonus, a start-up business spearheaded by his son. As owner and manager of Sonus, Mr. Pentecost knew Sonus that had no assets, no revenue, and no operating history, *i.e.*, that it was a bad credit risk that could not obtain $45,000 on an unsecured basis from a commercial lender.[101] Why would Mr. Pentecost ask Ms. Berry, of all people, to loan him such an extraordinary sum? The reason is obvious. Mr. Pentecost knew the extent of Ms. Berry's Schwab Account, and he knew he could exercise the powers Ms. Berry granted to him to liquidate assets and

---

[98] See RESTATEMENT (THIRD) OF TRUSTS § 77(2) cmt. b.

[99] See RESTATEMENT (THIRD) OF TRUSTS § 78. See also BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 543 *Trustee's duty of loyalty to the beneficiaries* (Westlaw June 2021 update).

[100] Tr. at 149.

[101] Tr. at 36.

borrow funds on margin to quickly fund a sizable loan. Mr. Pentecost exploited confidential information he gained as Ms. Berry's investment adviser and money manager for his own benefit. Then, he abused his influence as Ms. Berry's trusted investment adviser to persuade her that the loan was a safe investment and that he would pay her back.

Despite the inherent conflict of interest Mr. Pentecost faced in borrowing money from a client, he did not advise Ms. Berry to seek independent legal or financial advice. Worse, the Note Mr. Pentecost presented to Ms. Berry was sufficiently ambiguous regarding the identity of the borrower that Ms. Berry was led to believe Mr. Pentecost was personally liable for repayment of the Note while Mr. Pentecost could arguably claim that he was not.[102]

Using his power of attorney, Mr. Pentecost borrowed against assets in Ms. Berry's Schwab Account to fund the loan and facilitate the closing of the transaction, resulting in the transfer of $45,000 of Ms. Berry's savings to himself. Thereafter, he made no effort to

---

[102] Although the Note defines the "Borrower" as Sonus, Ms. Pentecost signed the Note without indicating that he was acting in a representative capacity for Sonus. Section 3-402 of Oklahoma's Uniform Commercial Code provides rules for resolving this type of ambiguity. Under that section, the representative "is liable on the instrument *unless* the representative proves that the original parties did not intend the representative to be liable on the instrument." 12A O.S. § 3-402(b)(2). Mr. Pentecost failed to prove that Ms. Berry did not intend Mr. Pentecost to be liable. Ms. Berry credibly testified that she did not intend to loan money to Sonus, and she was led to believe that Mr. Pentecost desperately needed the money and that he would pay her back within a few months.

In examining whether Mr. Pentecost committed defalcation or fraud while acting as a fiduciary, however, it does not matter whether Mr. Pentecost is personally liable on the Note. In soliciting and facilitating the loan, Mr. Pentecost consciously ignored the effect the loan would have on Ms. Berry's financial well-being (*i.e.*, it permanently depleted her investment base by twenty percent) in order to advance his own interest in Sonus— conduct antithetical in every respect to his duty of loyalty.

replenish Ms. Berry's account according to the terms of the Note, *i.e.*, within 45 days with interest.  Instead, he dissolved Sonus, and denied that he was liable on the Note.

As manager of her funds, Mr. Pentecost knew, and Ms. Berry specifically told him, that she "could not afford to lose that money."[103] Mr. Pentecost knew at the time he solicited the loan that Sonus was insolvent and that she likely *would* "lose that money." Yet he still encouraged and enabled the loan knowing it was a grossly unsuitable use of Ms. Berry's limited savings.

The Court easily finds and concludes that Mr. Pentecost consciously violated his fiduciary duties to Ms. Berry with respect to property entrusted to him. He exploited information gained in the fiduciary relationship for his own use and to the detriment of Ms. Berry. He violated duties spelled out in regulations specifically applicable to investment advisers, including the duty to refrain from borrowing money or securities from a client; the duty to "disclose to clients in writing *before any advice is rendered* any material conflict of interest relating to the investment adviser . . . which could reasonably be expected to impair the rendering of unbiased and objective advice;" and the duty not to recommend a client to invest in a security[104] "without reasonable grounds to believe that the recommendation is suitable for the client on the basis of information . . . concerning the client's investment profile," which includes "the client's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information disclosed by the

---

[103] Tr. at 149.

[104] "Security" includes "a note." 71 O.S. § 1-102(32).

client or known to the investment adviser or investment adviser representative."[105] As an experienced and credentialed investment adviser, he had "knowledge of . . . the improper nature of the relevant fiduciary behavior"[106] or he "consciously disregard[ed] . . . a substantial and unjustifiable risk that his conduct [would] turn out to violate a fiduciary duty."[107]

Thus, the Court concludes that Mr. Pentecost committed fraud and defalcation in his capacity as a fiduciary. Ms. Berry is entitled to a judgment in the amount of $76,090.50 ($45,000.00 principal and $31,090.50 interest)[108] plus attorney's fees and costs,[109] all of which shall be excepted from discharge pursuant to § 523(a)(4).

### 2.   *The Limited Partnership*

In 2018, Mr. Pentecost recommended that Ms. Berry invest $50,000 in PMPII, a limited partnership Mr. Pentecost formed with the goal of attracting and pooling capital to invest in the music publishing industry.  Again, Mr. Pentecost used information he gained as Ms. Berry's fiduciary to target $50,000 in Ms. Berry's Schwab Account for his own purposes. And again, Mr. Pentecost liquidated Ms. Berry's assets and borrowed on margin in her Schwab Account to fund an investment in his own venture.  Funds raised through

---

[105] Okla. Admin. Code 660:11-7-42(1), (6), and (11).

[106] Bullock, 569 U.S. at 269.

[107] Bullock, 569 U.S. at 274 (quotation marks and citations omitted).

[108] The interest component is calculated as follows: 6.58 years x 0.105 x $45,000 = $31,090.50.

[109] The Note provides that Ms. Berry is entitled to recover "any and all costs incurred . . . in collecting sums payable under this Note, including reasonable attorneys' fees and court costs in addition to other amounts due, without protest of any kind."  Plaintiff's Exhibit 1 at ¶ 13.

the subscription in PMPII were to be used to purchase an interest in Q-Factory, the same venture that Sonus unsuccessfully pursued in 2015. Mr. Pentecost's solicitation of Ms. Berry's participation in PMPII was self-serving, as he acted in the capacities of PMPII's promoter, issuer, organizer, general partner, manager, and investment adviser, and he expected to earn commissions and management fees for these services.

Mr. Pentecost acknowledged in the Memorandum and in the Limited Partnership Agreement that PMPII was a long-term, illiquid, speculative investment suitable only for sophisticated investors who understood and could financially tolerate the risk. Mr. Pentecost was well aware at the time he presented the investment to Ms. Berry that (1) his financial interest in funding and managing PMPII conflicted with his fiduciary duty to act in Ms. Berry's best interests, and (2) the investment was unsuitable for a client with Ms. Berry's investment profile.

Mr. Pentecost did not explain to Ms. Berry that he had a duty to avoid conflicts of interest when recommending investments to her, nor did he explain that such conflicts inherently impaired his objectivity in evaluating the suitability of PMPII as an investment for her.[110] Mr. Pentecost never advised Ms. Berry to seek independent financial or legal advice before investing in PMPII, and she did not obtain any such advice.  Mr. Pentecost could not and did not give Ms. Berry objective, unbiased, or sound investment advice.

---

[110] Mr. Pentecost had Ms. Berry sign the Private Placement Memorandum and Limited Partnership Agreement, both of which disclosed in writing some of Mr. Pentecost's various roles in PMPII. That disclosure did not relieve Mr. Pentecost of his duty to explain to Ms. Berry that his involvement was a material conflict of interest that likely impaired his ability to advise her consistent with his fiduciary duties, however.

Further Mr. Pentecost was constrained, not only by his fiduciary duties to Ms. Berry, but also by the Limited Partnership Agreement, to offer and sell limited partnership interests in PMPII only to "'qualified purchaser[s]' as that term is defined pursuant to the Investment Company Act and/or . . . 'accredited investor[s]' as that term is defined pursuant to Regulation D promulgated under the Securities Act of 1933."[111]  Mr. Pentecost knew that Ms. Berry was not a "qualified purchaser"[112] or "accredited investor,"[113] yet he pitched the investment to Ms. Berry nevertheless.  And to protect himself, Mr. Pentecost had Ms. Berry self-certify that she was "capable of evaluating the risks and merits of an investment in the Partnership Interests" "by reason of the Investor's knowledge and experience in financial and business affairs."[114] Mr. Pentecost knew that statement was false.[115]

---

[111] Defendant's Exhibit 1 at B-2.  See also id. at B-4 (The general partner has authority to admit as limited partners persons that the general partner "reasonably believes are 'qualified purchasers' . . . and/or 'accredited investors'").

[112] A natural person may be a "qualified purchaser" under the Investment Company Act if the person owns (individually or jointly with a spouse) "not less than $5,000,000 in investments." 15 U.S.C. § 80a-2(51)(A). Ms. Berry was not a "qualified purchaser" under the Act.

[113] A natural person may be an "accredited investor" under Regulation D if the person (individually or jointly with a spouse) has a net worth, excluding the value of their principal residence, in excess of $1 million; or has an annual income of at least $200,000; or is a certified or credentialed financial professional; or is a knowledgeable employee of the issuer of the securities.  17 C.F.R. § 230.501. Ms. Berry had none of these attributes.

[114] Defendant's Exhibit 1 at A-1 to A-3.

[115] Mr. Pentecost knew Ms. Berry had "limited" investment experience, and that she was not capable of evaluating risks and merits of investing in PMPII. Plaintiff's Exhibit 12. In fact, Ms. Berry lacked even a rudimentary understanding of the risks or merits of her investments. She stated that she just "trusted and believed in Dan Pentecost's advice and followed it forthwith." Tr. at 157.

As Ms. Berry's investment adviser, Mr. Pentecost without a doubt knew that PMPII was a wholly unsuitable investment for a client of Ms. Berry's age, financial condition, financial needs, investment time horizon, investment experience, and risk tolerance. At the time she purchased PMPII, Ms. Berry was almost 90 years old, she owned financial assets in her Schwab Account valued at $159,040,[116] which she relied upon to generate income to supplement her limited fixed income to make ends meet. Mr. Pentecost effected the liquidation of approximately *one-third* of Ms. Berry's Schwab Account assets and invested the proceeds in a risky, complex, under-capitalized and over-leveraged venture that he created and managed. The probability that Ms. Berry would see a return on her investment in PMPII within her lifetime was remote, and she could not sell—or even pledge—her interests in PMPII in the likely event her financial needs increased as she aged.

The Court again easily finds and concludes that Mr. Pentecost consciously disregarded his fiduciary duties to Ms. Berry in recommending that she invest in PMPII. He had no "reasonable grounds to believe that the recommendation [was] suitable for the client on the basis of information furnished by the client after reasonable inquiry concerning the client's investment profile."[117] And he used information, powers, and funds entrusted to him not only contrary to Ms. Berry's best interests, but also to further his own personal interests.

Thus, the Court concludes that Mr. Pentecost committed fraud and defalcation in his capacity as a fiduciary with respect to the PMPII investment, and Ms. Berry has been

---

[116] Exhibit C attached to Plaintiff's Exhibit 11.

[117] Okla. Admin. Code 660:11-7-42(1).

damaged by the breach. In the three years she has owned PMPII, Ms. Berry has not received a single dollar in distributions. The limited partnership interest, as an unregistered security, cannot be sold, and in any event, it is likely worthless because PMPII is in default of its debt obligations and has not been able to pay its debts as they come due-- *i.e.*, it is insolvent. Accordingly, Ms. Berry is entitled to a judgment against Mr. Pentecost in the amount of $50,000, plus $40 in miscellaneous fees, for a total of $50,040, which shall be excepted from discharge pursuant to § 523(a)(4).

C.    Section 523(a)(19)

Section 523(a)(19) excepts from a debtor's discharge any debt that –

(A)  is for –

(i) the violation of . . . any of the State securities laws, or any regulation or order issued under such . . . State securities laws; or

(ii)  common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B)  results, before, on, or after the date on which the petition was filed, from –

(i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

(ii)  any settlement agreement entered into by the debtor; or

(iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.[118]

The Court concludes that the debts liquidated above are also excepted from discharge under § 523(a)(19) because the conduct that met the standard of "fraud or defalcation while acting as a fiduciary" also violated Oklahoma securities laws and regulations.  The Court has already found that in borrowing $45,000 from Ms. Berry, Mr.

---

[118] 11 U.S.C. §523(a)(19).

Pentecost violated Oklahoma Administrative Code 660:11-7-42(6) (which prohibits borrowing money from clients), and that in advising Ms. Berry to sell one-third of her Schwab Account portfolio to invest in PMPII, Mr. Pentecost violated Oklahoma Administrative Code 660:11-7-42(1) (which prohibits recommending investments without reasonable grounds to believe that the investment is suitable for the client).  Because the Court is granting Ms. Berry complete relief under Section 523(a)(4), it is not necessary to belabor the record with a lengthy analysis of her Section 523(a)(19) claim.

**V.      Conclusion**

Mr. Pentecost committed fraud and defalcation in his capacity as a fiduciary and as a result, directed almost $100,000 of funds Ms. Berry entrusted to him from her Schwab Account to himself or to entities he controlled. Judgment will be entered against Mr. Pentecost in the amount of $126,130.50 and the debt shall be excepted from discharge pursuant to §§ 523(a)(4) and (a)(19). Ms. Berry is entitled to recover attorney's fees, expenses, and costs upon timely motion made pursuant to Fed. R. Civ. P. 54(d)(2) (made applicable herein by Bankruptcy Rule 7054(b)(2)).

**SO ORDERED** this 30th day of December, 2021.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT